**In re D.W.**

[Cite as *In re D.W.*, 184 Ohio App.3d 627, 2009-Ohio-5406.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23421.

Decided Oct. 9, 2009.

628

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Michele D. Phipps, Assistant Prosecuting Attorney, for appellee.

Kay M. Locke, Assistant Public Defender, for appellant.

WOLFF, Judge.

{¶ 1} D.W. appeals from the final judgment of the Montgomery County Court of Common Pleas, Juvenile Division, asserting as error that court's sustaining the state's objection to the magistrate's decision that granted D.W.'s motion to suppress. Following a plea of no contest, D.W. was found to be a delinquent child by reason of a violation of R.C. 2925.11(A)(C)(4)(a), possession of cocaine. He was committed to the legal custody of the Department of Youth Services for a minimum period of six months and a maximum period not to extend past his 21st birthday.

{¶ 2} Also before us is the state's motion to dismiss for failing to cause the record to be transmitted in a timely manner, which we hereby overrule.

{¶ 3} The events giving rise to this matter began on August 1, 2008, at approximately 9:20 p.m., when Officer Ronald E. Gustwiller, of the Dayton Police Department, received a dispatch regarding shots being fired and men arguing in the street in the area of Neal and Richmond Avenues. Gustwiller was heading north on Richmond Avenue at the time, three or four blocks from Neal, and he testified that he turned his cruiser around and proceeded to the intersection at Neal, arriving in 10 to 15 seconds.

{¶ 4} According to Gustwiller, as he approached the area, he saw four black males walking on the side of the street and, for his safety, due to the nature of the call, he immediately conducted a field interview with those four men to identify if any of them were involved with the shots-fired complaint. As he approached the men and identified himself, one of them fled. Gustwiller detained the other three, placing them in handcuffs. Gustwiller testified, "I didn't know if

that was the individual that possibly had the gun or the three * * * with me right there had a weapon on them."

{¶ 5} Gustwiller stated that shots-fired calls are common in the area of Neal and Richmond Avenues and that the area has a high crime rate and is known for drug activity. Gustwiller "quite often" makes arrests in the area, and he maintained that he had a reasonable suspicion that the three men he detained might have been armed, due to the nature of the dispatch.

{¶ 6} On cross-examination, Gustwiller testified that he has been a police officer for two years. He stated that the dispatch did not provide an address beyond the general location given. Gustwiller stated that D.W. was arrested at 16 Richmond Avenue and that the men were headed north on Richmond when he encountered them. Gustwiller's testimony on cross-examination was slightly unclear regarding the exact content of the dispatch. Regarding the voices heard by the tipster, he initially stated that the call "just said that there were people yelling." When he was then asked if the dispatch "was in reference to men yelling," Gustwiller stated, "I'm pretty sure that's what it said." Gustwiller stated that the call did not describe the men in any way, or how many of them there were. Gustwiller stated that the juveniles he observed were not yelling, and he did not observe a firearm in their possession.

{¶ 7} Officer Elizabeth Alley, who was on patrol at the intersection of Salem and Delaware Avenue when she received the dispatch, responded to the scene within seconds of Gustwiller. Alley stated that the area is a high-crime area. After the officers conferred, Alley patted D.W. down for officer safety. Alley felt a lump in his pocket, and upon inquiry, D.W. told her that it was a razor blade. Alley reached into D.W.'s pocket and retrieved what turned out to be a baggie with some crack, along with the razor blade. Alley placed D.W. under arrest.

{¶ 8} In her decision sustaining the motion to suppress, the magistrate relied in part upon *Florida v. J.L.* (2000), 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254, which "limited the situations where an investigative stop may be premised on information supplied by an anonymous caller." The magistrate determined that the "issue in the case at hand is whether the dispatch of 'shots fired' received by Officer Gustwiller and the subsequent observations by the officer justified the stop, seizure, and search of the Juvenile." Of significance to the magistrate were the vague nature of the dispatch, the fact that Gustwiller observed the four juveniles walking without conflict or commotion, and that D.W. did not flee but rather cooperated with the officers. The magistrate concluded, "[T]he totality of the circumstances, * * * including the very limited details provided in the radio dispatch and the juvenile's mere presence in the general vicinity where the shots allegedly had been fired, do not provide a reasonable, articulable suspicion that [the] juvenile had engaged in criminal activity to justify an investigative stop."

{¶ 9} In sustaining the state's objection to the magistrate's decision, the juvenile court stated, "First, * * * the suspected presence of a firearm is a relevant factor in finding reasonable suspicion. * * * Second, * * * flight from the police is a relevant factor in finding reasonable suspicion. * * * Third, * * * the high crime character of the area in question is a relevant factor in finding reasonable suspicion."

{¶ 10} D.W. asserts one assignment of error as follows:

{¶ 11} "The judge improperly overruled the magistrate's decision granting the motion to suppress evidence in this matter as search and seizure of the juvenile was not supported by a reasonable, articulable suspicion."

I

{¶ 12} "In a hearing on a motion to suppress, the trial court assumes the role of the trier of fact and is in the best position to resolve issues regarding credibility of witnesses and the weight of the evidence. * * * An appellate court's role, while relying on the trial court's findings of fact, is to determine, without deference to the trial court, whether the facts meet the appropriate legal standard. Accordingly, conclusions of law are reviewed de novo. * * *

{¶ 13} "At a suppression hearing, the state bears the burden of proving that a warrantless search or seizure meets Fourth Amendment standards of reasonableness. *Maumee v. Weisner* [1999], 87 Ohio St.3d 295, 297, 720 N.E.2d 507, * * * citing 5 LaFave, Search and Seizure (3 Ed.1996), Section 11.2(b). In the case of an investigative stop, this typically requires evidence that the officer making the stop was aware of sufficient facts to justify it. *Id.,* citing *Terry v. Ohio* (1968), 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889." *State v. Davis,* Montgomery App. No. 22775, 2009-Ohio-2538, 2009 WL 1515701, ¶ 11–12.

{¶ 14} "The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Not all interactions between citizens and the police, however, constitute a seizure. Rather, the interactions between citizens and law enforcement officers can fall within three distinct categories: a consensual encounter, an investigative detention, and an arrest. *State v. Taylor* (1995), 106 Ohio App.3d 741, 747–749, 667 N.E.2d 60.

{¶ 15} " * * *

{¶ 16} "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. * * * Under *Terry,* police

officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot.  * * * 'Reasonable suspicion entails some minimal level of objective justification for making a stop—that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' *State v. Jones* (1990), 70 Ohio App.3d 554, 556–557, 591 N.E.2d 810, citing *Terry*, 392 U.S. at 27[, 88 S.Ct. 1868]. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.'  * * * *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271." *State v. Lewis,* Montgomery App. No. 22726, 2009-Ohio-158, 2009 WL 105635, ¶ 20–23.

{¶ 17} "When an investigative stop is made in sole reliance upon a police dispatch, the state must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity. *Id.* 'This can be accomplished in either of two ways.  The State may show that the source had previously provided the officer information that proved to be correct. Or, if that prior experience is lacking or the source was anonymous, the State may show that subsequent events corroborated the substance of the tip. *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.  However, the corroboration must demonstrate that the tip was "reliable in its assertion of illegality, not just its tendency to identify a determinate person." ' *State v. Yeatts,* Clark App. No. 02CA45, 2002-Ohio-7285[, 2002 WL 31888143], at ¶ 12, citing *J.L.,* 529 U.S. at 272 [120 S.Ct. 1375, 146 L.Ed.2d 254].

{¶ 18} "* * *

{¶ 19} "In *Florida v. J.L.,* an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.  Officers went to the bus stop and found three black males, one of whom, J.L., was wearing a plaid shirt.  Apart from the tip, the officers had no reason to suspect any of the three of criminal activity.  The officers did not see a firearm or observe any unusual movements.  The officers approached J.L., frisked him, and seized a gun.  *J.L.,* 529 U.S. at 268 [120 S.Ct. 1375, 146 L.Ed.2d 254].

{¶ 20} "The Supreme Court reversed J.L.'s conviction.  It held that an anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person.  *Id.* at 271 [120 S.Ct. 1375, 146 L.Ed.2d 254].  * * *  We have followed the reasoning in *J.L.* in numerous cases.  * * *

{¶ 21} " 'This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for [an investigative] stop.' *Alabama v. White* (1990), 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301. A stop is lawful if facts relayed are sufficiently corroborated to furnish reasonable suspicion that the defendant was engaged in criminal activity. *Id.* at 331, 110 S.Ct. 2412, 110 L.Ed.2d 301." *Davis*, 2009-Ohio-2538, ¶ 13–17.

{¶ 22} Regarding the flight of a suspect, "[o]ur cases have * * * recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. * * * Headlong flight—wherever it occurs—is the consummate act of evasion; [i]t is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 47.

{¶ 23} In *Jordan*, police responded to an anonymous tip that "a black male was 'doing drugs' on the porch of 2019 West 105th Street in Cleveland, Ohio, and that the same male had earlier been driving a light blue car, which was now parked in front of that address. Officer Martinez described the location as a 'high-drug activity area' to which he had gone concerning drug activity 'a couple of hundred times' over five and one-half years. Upon arriving in a marked police vehicle, he observed Jordan and another man sitting on the front porch and a blue vehicle fitting the tipster's description parked nearby. As the uniformed officers approached [the men], Jordan 'hollered something' to his companion, who immediately fled through the house and out the back door. Jordan, however, remained on the porch. Officer Martinez explained to Jordan that they had received a report of a 'black male selling drugs from that porch, and driving that vehicle.' Upon being asked, Jordan confirmed that the vehicle belonged to him." Id., ¶ 31.

{¶ 24} Martinez conducted a pat down search, finding a crack pipe in Jordan's pocket. On appeal, the appellate court held that "based on the anonymous tip being partially confirmed by the presence of the blue car, the flight of the other man when Jordan spoke to him upon the officer's arrival, and the area being known for high drug activity, the officer had a reasonable suspicion of criminal activity to support an investigatory stop. * * * The court further determined that these circumstances, together with Officer Martinez's testimony that, in his experience, it was common for individuals involved in drug activity to have weapons, created a reasonable suspicion that Jordan was armed, justifying a protective pat-down for weapons." Id., ¶ 33.

{¶ 25} Jordan argued in part to the Supreme Court of Ohio that his companion's unprovoked flight should not be imputed to him, and in ruling for the state, the Supreme Court determined that "the officers did not base their decision to conduct an investigative stop of Jordan solely on either the partially corroborated anonymous tip or on the companion's flight. Rather, they considered the totality of the circumstances; their receipt of an anonymous tip regarding drug activity that they were able to partially confirm, the residence location in an area known to them as a high drug activity area, Jordan's shout upon seeing their approach in uniform, and his companion's immediate flight." Id., ¶ 52.

{¶ 26} The Eighth District recently addressed the implications of one suspect's unprovoked flight upon another suspect under circumstances more akin to the matter herein. In *State v. Whitsette*, Cuyahoga App. No. 92566, 2009-Ohio-4373, 2009 WL 2624801, Cleveland police responded to an anonymous tip that two suspects were engaged in drug activity in a specific area of Cleveland. "The informant had told the officers that the men drove a blue Thunderbird and often had weapons on their person, which they had fired at all hours of the night." Id., ¶ 4.

{¶ 27} When the officers arrived at the designated location, they observed a blue Thunderbird parked in the driveway, occupied by two men. Upon the approach of the officer's undercover car, the passenger fled from the Thunderbird. One officer chased the fleeing suspect, and another officer ordered Whitsette out of the car and conducted a patdown, based upon the tip that the two men had guns. The officer retrieved marijuana, cocaine, and cash from Whitsette's pocket. The trial court sustained Whitsette's motion to suppress. Id., ¶ 5–6.

{¶ 28} In affirming the judgment of the trial court, the Eighth District determined, citing *J.L.* and *Jordan*, that the "tip failed to provide the officers with information that indicated that the caller indeed knew inside information about the illegal activity. Only general descriptive information was provided. Thus, although the officers were able to partially confirm the tip, that is, a blue Thunderbird was located in the vicinity * * * more was needed for the officers to legally conduct an investigative stop.

{¶ 29} "Additionally, looking at the totality of the circumstances, there was insufficient surrounding circumstances to provide the officers with reasonable suspicion of criminal activity. Although the area was a high drug/gang activity area, Whitsette was not acting in a suspicious manner. He was merely sitting in the car in the driveway. No one approached the car, and the officers did not observe any furtive movements. He simply sat in the car. Although his passenger ran from the car upon seeing police, this conduct does not implicate Whitsette." Id., ¶ 12–13.

{¶ 30} Although the state argued that *Whitsette* was analogous to *Jordan,* the Eight District found the cases distinguishable, noting, "[T]here was no interaction between Whitsette and the fleeing person that would create a reasonable suspicion that he was engaged in criminal activity. There was no evidence that Whitsette said anything to the passenger, he did not make any furtive movements, no one approached the vehicle, and he did not attempt to flee. Some evidence that criminal activity was afoot was needed, either in the form of the officer's observing Whitsette engage in suspicious behavior or upon the informant providing information indicating he or she had 'knowledge of concealed criminal activity.' " Id., ¶ 15.

{¶ 31} Regarding the fact that the area at issue herein was one of high crime activity, we "have previously stated that a '[d]efendant's mere presence in a high crime area, standing alone, is not sufficient to support a reasonable suspicion of criminal activity. It is, however, a relevant consideration in determining whether the totality of the facts and circumstances are sufficiently suspicious to warrant further investigation. *Illinois v. Wardlow* (2000), 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570.' " *State v. Taylor,* Montgomery App. No. 20665, 159 Ohio App.3d 629, 2005-Ohio-804, 824 N.E.2d 1057, ¶ 18.

## II

{¶ 32} The issue before us is whether the police had a reasonable, articulable suspicion that D.W. was armed. We conclude that they did not. There is no evidence that the tipster was a known or identified informant, and, accordingly, the state had to show that subsequent events corroborated the content of the tip. Here, Gustwiller was able to only partially corroborate the information in that he observed four males present in the area specified in the dispatch. There was no description in the tip, as the magistrate noted, of the men or people the tipster heard yelling, or their number, or when the alleged yelling and firing of shots occurred, and the four juveniles that Gustwiller encountered were not yelling or in observable disagreement. Gustwiller also did not observe any furtive movements on the part of D.W. suggestive of illegal conduct. In other words, the juveniles were just walking together down the street, certainly not a remarkable occurrence given the relatively early hour of the evening. The fact that they were in a high crime area standing alone does not create reasonable suspicion of criminal activity.

{¶ 33} While the juvenile court relied in part upon *State v. Johnson* (Oct. 23, 1997), Cuyahoga App. Nos. 71249 and 71250, 1997 WL 661882, to justify the stop due to the suspected presence of firearms, we find *Johnson* inapplicable. In *Johnson,* an anonymous tip described recently fired gunshots coming from a bright yellow car, recent model, in a specific area, and the Eighth District

determined, the "uniqueness of this auto color * * * together with the close proximity in time and space between the tip and the discovery of the car, was sufficient to justify the stop of the car *but only because of the urgency of the recent gunshots.*" (Emphasis added.) Id. *Johnson* was decided before *J.L.,* and as we noted in *Davis,* while the suspected presence of a weapon justifies a sense of urgency on the part of responding officers, "the *J.L.* court * * * declined to adopt the argument that the standard *Terry* analysis should be modified by a 'firearm exception' which would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." *Davis,* 2009-Ohio-2538, ¶ 20.

{¶ 34} Pursuant to standard *Terry* analysis, D.W. exhibited no conduct suggestive of the presence of weapons or criminal activity, he cooperated with the officers, and the tip that resulted in his detention, unlike the tip in *Johnson,* was vague as to any details beyond location. We further conclude, as in *Whitsette,* that the flight of D.W.'s companion does not implicate D.W., and the juvenile court's reliance upon *State v. Alexander* (1997), 120 Ohio App.3d 164, 697 N.E.2d 255, to find otherwise, is misplaced. In *Alexander,* two Cleveland police officers were on routine patrol at approximately 4:00 a.m. in an area known for a high incidence of drug activity, mostly involving sales by pedestrians to passing motorists. The officers "observed the defendant and a couple of other males along the roadway, attempting to flag down passing automobiles. The officers observed a vehicle stop in front of a boarded-up house, observed males (one of whom was the defendant) approach the stopped car and return to the sidewalk area a short time later, at which time the stopped car drove away." The officers suspected that they had observed a drug transaction and approached the three men, who fled. Clearly, while the officers in *Alexander* observed suspected criminal activity followed by flight, Gustwiller observed no such suspected criminal activity nor flight from D.W.

{¶ 35} Finally, we note that the cases cited by the magistrate support our conclusion that D.W.'s motion to suppress should have been sustained. For example, in *State v. Bankston,* Cuyahoga App. No. 80378, 2002-Ohio-3446, 2002 WL 1454060, the Eighth District distinguished *J.L.* and upheld a *Terry* stop where a police officer, in responding to an anonymous tip of recently fired shots from a gray Chrysler Concorde, in a specific area, observed such a vehicle in the area specified and also observed Bankston's furtive body movements inside the car, movements that were consistent with hiding a weapon. According to the Eighth District, the officer "not only corroborated the information supplied by the dispatch, but also observed Bankston's body movements, which aroused his suspicions of illegal conduct and provided the indicia of reliability under the totality of the circumstances." Id., ¶ 16.

{¶ 36} Since insufficient circumstances existed to justify the stop and frisk of D.W., his sole assignment of error is sustained, the judgment of the juvenile court is reversed, and the matter is remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

GRADY and FROELICH, JJ., concur.

WILLIAM H. WOLFF JR., J., retired, of the Second District Court of Appeals, sitting by assignment.