[Cite as *State v. Stewart*, 193 Ohio App.3d 716, 2011-Ohio-2910.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 95130

THE STATE OF OHIO,

APPELLEE,

v.

STEWART,

APPELLANT.

JUDGMENT:
REVERSED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas

Case No. CR-530373

BEFORE:   Stewart, J., Kilbane, A.J., and E. Gallagher, J.

RELEASED AND JOURNALIZED:   June 16, 2011


William D. Mason, Cuyahoga County Prosecuting Attorney, and John P. Colan, Assistant Prosecuting Attorney, for appellee.


Robert L. Tobik, Cuyahoga County Public Defender, and Cullen Sweeney, Assistant Public Defender, for appellant.



MELODY J. STEWART, Judge.

{¶ 1}  Defendant-appellant, Kevin Stewart, was convicted of a single count of carrying a concealed weapon on a no-contest plea entered after the court denied his motion to suppress evidence of a gun seized during a police *Terry* stop.  His sole assignment of error is that the court erred by denying the motion to suppress.

{¶ 2}  A shooting occurred at about 1:30 a.m. in a residential neighborhood.  Police officers responded almost immediately to the scene and spoke with witnesses.  A defense witness who testified at the suppression hearing told the police on the scene that the shooter was "something like" six feet tall and "looked like" he had braids under a hat, although the witness

conceded, "I didn't really pay any attention to him* * *." She also said that the shooter had a number tattooed on his face and wore a black shirt and black pants.

{¶ 3} Two more officers arrived on the scene just two to three minutes after receiving the call about the shooting. They were assigned the task of seeing whether the shooter might still be on foot in the neighborhood. These officers were told that there were two suspects: a male described as around 5'10" to six feet tall in his late 20s or early 30s and in dark clothing, and a female. The suspects were last seen walking east. The police entered their car and headed east on Bellaire. About five minutes later, some three blocks from the shooting, they saw Stewart and a female walking through a parking lot. They exited the car and asked Stewart whether he carried any weapons. Stewart "looked both ways" but did not reply. Fearing that he might be armed, the officers patted him down and found a .44 Magnum in Stewart's waistband.

{¶ 4} Stewart is actually 5'8" tall and 20 years old and was not involved in the shooting. One of the arresting officers testified that he and his partner did not see the initial report prepared by officers on the scene of the shooting (that report was likely prepared several hours after the shooting), so they went only by the description of an African American male in black clothing with an African American female. The officers focused on looking

for a male and female in the area east of the shooting, and they saw Stewart and the female from 500 feet away as they were driving.

{¶ 5} Stewart and his girlfriend testified that they had just exited their car after parking in the parking lot of Stewart's building. A police car appeared. The officers exited the police car and put Stewart up against his car, frisking him and finding a gun. Stewart conceded that he was asked whether he had a weapon and did not respond. The girlfriend said that Stewart was wearing blue jeans, a white hoodie, and a blue and white cap. Stewart did not wear his hair in braids and had no tattoo on his face.

{¶ 6} In oral findings of fact and conclusions of law, the court found that the totality of the circumstances supported a finding that the police had a reasonable and articulable suspicion that Stewart was engaged in criminal activity, given the initial description of a male and female leaving the scene of the shooting. The court found that the stop occurred so quickly after the officers left the scene of the shooting that the officers were justified in making the stop.

{¶ 7} The standard for justifying the stop in this case is whether the officers had a reasonable suspicion that Stewart had been engaged in criminal activity. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. In a case like this where the police officers who make the stop receive information from other police officers, the collective-knowledge doctrine

applies. That doctrine states that law-enforcement officers cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. *United States v. Hensley* (1985), 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604. The doctrine is grounded upon the realization that " 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.' " Id. at 231, quoting *United States v. Robinson* (1976), 536 F.2d 1298, 1299. The admissibility of the evidence uncovered during a stop based on information derived from other officers does not rest upon whether the officers relying upon a dispatch or flyer "were themselves aware of the specific facts which led their colleagues to seek their assistance," but instead on whether the officers who issued the dispatch possessed reasonable suspicion to make the stop. Id. at 231.

{¶ 8} Factors relevant in assessing reasonable suspicion in this case include the specificity of the description of the suspect, the number of people in the area, where the person was stopped, and how long ago the crime occurred. See *United States v. Goodrich* (C.A.3, 2006), 450 F.3d 552, 561. Even though a description is less than specific, other factors supporting the

stop can exist so long as the facts known yield a limited pool of suspects. *United States v. Broomfield* (C.A.7, 2005), 417 F.3d 654, 655.

{¶ 9} The description given to the officers on the scene and relayed to the arresting officers was not specific enough to justify the investigative stop. One of the arresting officers conceded that "[t]he description was vague to start with." Given the character of the neighborhood and the late hour, the description of the male would have matched just about any other male who might have been out at that time of night. Even so, Stewart did not match the description, as he was significantly younger and shorter than the described shooter. Indeed, the description of the shooter relayed by the police at the scene was highly incomplete, as the testimony showed that the suspect might have been wearing braids and had a facial tattoo — two very specific identifying characteristics that could have easily narrowed the range of possible suspects.

{¶ 10} We are aware that in *State v. Morgan*, 8th Dist. No. 94371, 2010-Ohio-5013, we upheld the propriety of an investigatory stop based on information from an identified citizen that the perpetrator of a crime was driving a black Cadillac. *Morgan* is not factually on point because the description given to the officers in that case was much more specific than that given in this case. Information providing the make and color of a car significantly narrows the choices from all other cars on the road — not every

car is a Cadillac and not every Cadillac is black. But in a predominantly African American neighborhood, an admittedly "vague" description of someone as an African American male near 30 years of age and between 5'10" and 6 feet tall does little to narrow the scope of possible suspects and provide a constitutional basis for an investigatory stop.

{¶ 11} Additionally, although one of the arresting officers testified that Stewart met the description they were given, including wearing dark clothing, both Stewart and his girlfriend testified that Stewart was wearing a white hoodie. Although this major discrepancy in Stewart's clothing is one the trial court could have resolved in favor of the arresting officer, instead of doing so on the record, the court failed to address it at all.

{¶ 12} Before issuing its decision, the trial court summarized the testimony presented at the suppression hearing. When recounting Stewart's and his girlfriend's testimony, the court stated, "[The girlfriend] and the defendant testified, and their stories were consistently similar. Went to the defendant's apartment complex, both got out, walking to defendant's apartment. They were stopped by police. The defendant was searched and weapons were found. That was the basis of [the girlfriend's] testimony and the defendant Kevin Stewart's testimony." Nowhere does the court acknowledge the testimony about the clothing discrepancy. One can only conclude that the testimony was not considered.

{¶ 13} Arguably, any discussion concerning the specificity of the description may ultimately be beside the point because the testimony of one of the arresting officers indicates that the information given to them, other than ethnicity and gender, did not have much bearing on their decision to stop Stewart and his companion. When asked whether Stewart matched the description he had been given at the scene, one of the officers testified, "To be honest with you, when we first saw him, we saw a black male and a black female. We started heading that way and he was – he matched an approximate height and weight, yes. He wasn't overly tall or extremely short. So, yeah, he was going to be a person of interest." The officer later conceded that Stewart had been doing nothing suspicious. "We were going to check out anybody that was out at that hour." In response to the statement, "I think your testimony before was basically you saw an African American male and female, that's why you stopped them," the officer replied, "Correct."

{¶ 14} This testimony suggests that the officers were committed to stopping any young African American couple they encountered. They thus admittedly lacked a reasonable suspicion that Stewart had been engaged in criminal behavior, so the stop was invalid.

{¶ 15} We are sensitive to the fact that a shooting had been reported a short time prior to the officers' seeing Stewart and that the proximity of the shooting to the time of their stop gave the officers a justifiable concern for

their safety. When a gun is fired at the scene of the crime, officers can be justified in acting quickly to frisk a suspect for weapons if the suspect meets the general description given to them. *United States v. Drake* (C.A.7, 2006), 456 F.3d 771, 775. But the need to act out of concern for their own safety did not legitimize the indiscriminate stop and frisk of the first couple that they saw walking through a parking lot. Until they actually stopped the couple, the officers had no reasonable concern for their personal safety, as they admitted that Stewart had been doing nothing more suspicious than walking through a parking lot in the company of a female.

{¶ 16} Finally, Stewart's actions at the time of the stop did not give the police a basis for frisking him for weapons. Stewart did not respond when asked whether he had any weapons. One of the officers testified, "[I]f you ask a question with a yes or no answer, anything but a no is a yes. When I asked him if he had any weapons on him and he didn't respond, there was a high probability he had a weapon on him." Assuming that the encounter had been consensual to that point, Stewart was free not to answer any questions by the police. *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497. His constitutionally protected right not to speak with the officer in a consensual encounter could not provide a basis, in the absence of other factors, to justify a pat-down.

{¶ 17} The only other factor that arguably came into play was Stewart's act of looking both ways after being asked whether he had any weapons. Even assuming that an act in plain view of the police could be considered furtive, furtive movements alone are insufficient to render an officer's suspicions about criminal activity or the possession of weapons reasonable. *State v. Kessler* (1978), 53 Ohio St.2d 204, 208, 373 N.E.2d 1252. In any event, one of the police officers dispelled any notion that Stewart's act of looking both ways had something to do with his being patted down. He said, "I simply asked this male if he had any weapons on him. And when I got the answer that I did, then it was time for a stop."

{¶ 18} The law is clear that the police cannot conduct an investigatory stop unless they have a reasonable, articulable suspicion that criminal activity has occurred. The police in this case were given such a "vague" description of the shooter that they were determined to stop any young African American couple whom they saw walking in the area. Although there were legitimate concerns for officer safety in light of a report that a firearm had been discharged, those concerns standing alone did not warrant the indiscriminate stopping of any person without regard to a more specific description. We thus find that the court erred by denying the motion to suppress evidence of the gun seized during the pat-down.

**{¶ 19}** This cause is reversed and remanded for proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

GALLAGHER, J., concurs.

KILBANE, A.J., dissents.

MARY EILEEN KILBANE, A.J., dissenting.

**{¶ 20}** I respectfully dissent from the majority's decision and would uphold the search.

**{¶ 21}** The majority acknowledges that when a gun is fired at the scene of the crime, officers can be justified in acting quickly. This principle is rooted in the notion that " 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.' " *United States v. Hensley* (1985), 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604, quoting *United States v. Robinson* (C.A.9, 1976), 536 F.2d 1298, 1299.

{¶ 22} The majority also acknowledges this court's decision in *State v. Morgan*, 8th Dist., No. 94371, 2010-Ohio-5013, but finds it factually distinguishable because the description in *Morgan* was much more specific than the description in the instant case. I disagree.

{¶ 23} In *Morgan*, this court upheld the denial of a motion to suppress evidence when a police officer, who had responded to a call of shots fired, received information from an identified citizen and stopped a black Cadillac moments later. The officer was asked at the suppression hearing "if there was anything specific 'that would set this black Cadillac apart from all the scores of other black Cadillacs that you would perhaps see on your route.' [He] responded, 'It was the first one we came across. Other than that, there was nothing special.'" Id. at ¶ 14.

{¶ 24} Just like in *Morgan*, in the instant case, the officers stopped the first African American male and female they observed, and they did not point to anything specific that set Stewart apart from other individuals on their route. One of the officers testified that Stewart was a person of interest because he was the first African American male with an African American female they observed and that Stewart "matched an approximate height and weight." The officer further testified they "were going to check out anybody that was out at that hour."

{¶ 25} When the officers approached Stewart and asked him whether he had any weapons on him, Stewart looked left, then looked right. This furtive movement prompted the officer to pat down Stewart for safety. The officers were concerned when Stewart did not immediately respond to the question "Do you have a weapon?" because they had just left the shooting scene only minutes earlier, which was approximately three blocks away, and Stewart matched the description of the possible suspect.

{¶ 26} This court has found that "a report of recent gunshots must be taken into consideration under the totality of the circumstances test." *State v. Johnson* (Oct. 23, 1997), Cuyahoga App. Nos. 71249 and 71250. In *Johnson*, this court reversed the trial court's grant of a motion to suppress evidence when the police stopped a car within ten minutes of receiving the tip that gunshots were fired from a yellow car. We emphasized the fact that "the report was for more than just guns, it was for *gunshots recently fired*." (Emphasis sic.) On the other hand, with a tip concerning only drugs, "mere corroboration of neutral details is insufficient to satisfy the Fourth Amendment for an investigatory stop." Id.

{¶ 27} Thus, I would find that Stewart's actions, together with the close proximity in time and space of the recent shooting, was sufficient to justify the officers' investigative stop and subsequent pat-down.

**{¶ 28}** Accordingly, I would find that the trial court properly denied Stewart's motion to suppress.