[Cite as *State v. Henson*, 2022-Ohio-1571.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-210244 |
| | | TRIAL NO. B-2005599 |
| Plaintiff-Appellant, | : | |
| vs. | : | *O P I N I O N.* |
| MONTEZ HENSON, | : | |
| Defendant-Appellee. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:    May 11, 2022

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellee.

ᴢᴀʏᴀs, **Presiding Judge**.

{¶1}    Plaintiff-appellant state of Ohio appeals the decision of the Hamilton County Court of Common Pleas granting a motion to suppress filed by defendant-appellee Montez Henson.  We overrule the state's sole assignment of error, and we affirm the trial court's judgment.

### *Factual Background*

{¶2}    The record shows that on October 25, 2020, at 10:13 p.m., Cincinnati police officers were dispatched to the Westwood area of Cincinnati on a report from the Shot Spotter Alert System of shots fired.  Shot Spotter is a system of sensors placed throughout the city that can register the sound of gunfire and distinguish it from other sounds such as fireworks.  A live dispatcher for Shot Spotter receives the alert and determines whether the sound was in fact gunfire and if there were multiple gunshots.  The system then triangulates the location of the sound to provide a radius on a map as to where the shots came from, and the dispatcher relays that information to the police.

{¶3}    The Shot Spotter dispatch directed the police to 2528 to 2568 Hansford Place, a residential dead-end street.  Within five minutes, a plain-clothes officer arrived at the scene.  He said that he observed a man alone in the street.

{¶4}    Officer Jason Wallace, who was assigned to the Gun Crimes Task Force, was patrolling in Westwood, which was an area well known for gun activity.  He received the dispatch about shots fired.  The plain-clothes officer on the scene notified him that there was a man alone at the scene.  Officer Wallace arrived about three minutes after the plain-clothes officer.

{¶5}    He saw a man later identified as Henson "halfway in the back of his vehicle."  Even though the plain-clothes officer stated that Henson was alone, video from Officer Wallace's body camera showed that he was placing three young children

in the rear seat of his vehicle when he arrived. Officer Wallace and his partner approached Henson and asked if he had heard any gunfire. Henson replied that he had not.

{¶6} Officer Wallace testified that it was rainy and dark. When he told Henson that he was going to pat him down for weapons, Henson became "very agitated," and "kind of turned his body away" from the officer. Officer Wallace told Henson that he was going to pat him down for weapons because there were shots fired in the area, and he wanted to make sure Henson was not armed. Officer Wallace found a loaded handgun in Henson's waistband. He then placed Henson under arrest. Methamphetamine and cocaine were found on his person.

{¶7} Henson was indicated for aggravated trafficking in drugs, aggravated possession of drugs, trafficking in cocaine, possession of cocaine, carrying concealed weapons, and having a weapon while under a disability. He filed a motion to suppress all evidence recovered from the warrantless seizure and search of his person. The trial court agreed that there was an unconstitutional seizure and granted the motion to suppress. The state has filed a timely appeal under R.C. 2945.67, with the certification required by Crim.R. 12(K).

{¶8} In its sole assignment of error, the state contends that the trial court erred in granting the motion to suppress. It argues that Officer Wallace had a reasonable suspicion of criminal activity sufficient to detain and question Henson, and that the pat-down search of Henson's person was constitutional. This assignment of error is not well taken.

### Standard of Review

{¶9} Appellate review of a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent,

credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Houston*, 1st Dist. Hamilton No. C-190598, 2020-Ohio-5421, ¶ 56.

### *A Consensual Encounter*

{¶10} There are three general categories of police-citizen contact for purposes of determining the protections afforded by the Fourth Amendment. These categories include (1) a consensual encounter, (2) an investigative detention or "*Terry* stop," and (3) an arrest. *State v. Hall*, 2016-Ohio-783, 60 N.E.3d 675, ¶ 16 (1st Dist.); *State v. Mitchem*, 1st Dist. Hamilton No. C-130351, 2014-Ohio-2366, ¶ 17, both citing *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶11} The United States Supreme Court had held that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. As long as a reasonable person would feel free to leave or go about his or her business, the encounter is consensual and no reasonable suspicion is required. *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *State v. Richardson*, 1st Dist. Hamilton No. C-200187, 2021-Ohio-2751, ¶ 14.

{¶12} Simply because most people respond to a police request without being told they are free not to respond does not eliminate the consensual nature of the response. *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Richardson* at ¶ 15. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred" within the meaning of the Fourth Amendment. *Bostick* at 434; *In re J.C.*, 1st Dist. Hamilton Nos. C-180478 and C-180479, 2019-Ohio-4815, ¶ 12.

**{¶13}** The initial interaction between Henson and the officers was a consensual encounter. The officers, responding to the Shot Spotter report, approached Henson and asked if he had heard any gunfire. He replied that he had not. At that time, none of the facts and circumstances demonstrated a show of authority sufficient to turn a consensual encounter into a seizure.

### A Pat-Down Search

**{¶14}** Immediately after encountering Henson, the police officers patted him down for weapons. At that time, there was a seizure within the meaning of the Fourth Amendment. Whether a seizure has occurred is a question of fact to be determined from the totality of the circumstances. *Michigan v. Chestnut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *Richardson*, 1st Dist. Hamilton No. C-200187, 2021-Ohio-2751, at ¶ 15.

**{¶15}** Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), when an officer is justified in believing that an individual may be armed and presently dangerous, the officer may conduct a limited protective search of the individual for concealed weapons. *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 9. The rationale behind the search is to allow the officer to take reasonable precautions for the officer's own safety so that he or she may pursue the investigation without fear of violence. *State v. Andrews*, 57 Ohio St.3d 86, 89, 565 N.E.2d 1271 (1991). If circumstances exist that would cause a reasonable officer to believe that his or her safety was in danger, the officer can conduct a pat-down search of the individual's outer clothing to determine whether the defendant is carrying a weapon. *State v. Billups*, 1st Dist. Hamilton No. C-150500, 2017-Ohio-4309, ¶ 11.

**{¶16}** The prosecution bears the burden of proving the constitutionality of a *Terry* frisk. *State v. Thompson*, 1st Dist. Hamilton No. C-050400, 2006-Ohio-4285,

¶ 8; *State v. Warren*, 129 Ohio App.3d 598, 602, 718 N.E.2d 936 (1st Dist.1998). The protective search or "frisk" is "limited in scope to a pat-down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior the officer is investigating at close range may be armed and dangerous." *Andrews* at 89. The standard is an objective one, based solely on the totality of the circumstances. *Andrews* at 89; *Thompson* at ¶ 9.

{**¶17**} Reasonable suspicion is an "elusive concept," and "[p]recisely defining reasonable suspicion is not possible." It is not readily reduced to a "neat set of legal rules." *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 20. It is a less demanding standard than probable cause. *Id.*; *In re J.C.*, 1st Dist. Hamilton Nos. C-180478 and C-180479, 2019-Ohio-4815, at ¶ 14. But it is something more than an "inchoate and unparticularized suspicion or 'hunch.' " *Hawkins* at ¶ 20; *In re J.C.* at ¶ 14.

### *The Totality of the Circumstances*

{**¶18**} In this case, the stop and the pat-down search occurred simultaneously as the officers had to detain Henson to conduct the pat-down search. Viewing the totality of the circumstances, we hold that the police officers did not have a reasonable and articulable suspicion to cause a reasonable officer to conclude that Henson was armed and dangerous and that the officers' safety was in danger.

{**¶19**} The state argues that this case is similar to *Hairston*, in which police officers responded to a dispatch about a domestic dispute. As they were getting out of their cruiser, they heard four or five gunshots, which "appeared to be close." The officers jumped into their cruiser and rushed to the where the shots seemed to be coming from, which was outside a nearby elementary school.

**{¶20}** It took the officers about 30 to 60 seconds to get to the intersection near the school. As they approached the intersection, they spotted the defendant walking away from the school while talking on a cell phone. There was no one else around.

**{¶21}** The officers exited from their cruiser with weapons drawn and ordered the defendant to stop. One of the officers asked the defendant if he had heard the shots, and the defendant replied that he had. When the officer asked if he had any weapons, the defendant said that he had a gun and nodded toward his jacket pocket. The officer patted him down and retrieved a handgun from his jacket. The defendant talked to the officers calmly, but "was somewhat nervous."

**{¶22}** One of the officers testified that he had patrolled the zone where he had been working that night for six years. He said that drug activity, assaults, robberies, and domestic violence frequently occurred in the area around the school during the evening hours. He had previously made arrests there for those types of offenses, including gun-related arrests.

**{¶23}** In *Hairston*, the police approached with their weapons drawn, and the issue before the court was whether there was a constitutional Terry stop. *See Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, at ¶ 9 and 11-14. The issue before us is whether there was a constitutional *Terry* pat down. *See State v. Millerton*, 2d Dist. Montgomery No. 26209, 2015-Ohio-34, ¶ 25. Nonetheless, we are addressing *Hairston* as we find it instructive in determining whether the totality of the circumstances supports a reasonable suspicion that Henson was armed and dangerous.

**{¶24}** The Ohio Supreme Court held that the officers had a reasonable suspicion of criminal activity sufficient to justify the stop of Hairston. That holding was based on the fact that (1) rather than relying on secondhand information, the officer personally heard the gun shots, which were not faint and sounded like they were nearby, and the officer immediately reacted to the sound of nearby gunfire; (2) the

officer knew from personal experience that crime often occurred at night in the area where the stop took place; and (3) the stop occurred very close in time to the gunshots, and the defendant was the only person there. *Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1122, at ¶ 11-13. Significantly, the court discussed that the third "considerations" were the most important. *Id.* at ¶ 13.

{¶25} This case is distinguishable in some important ways. First, Officer Wallace did not personally hear the gunshots. In discussing the facts in *Hairston*, the Supreme Court noted, "This is not a case in which the officers relied on a radio dispatch or other secondhand information about shots being fired, * * * but one in which they heard and immediately reacted to the sound of nearby gunfire." *Id.* at ¶ 11. The officers in *Hairston* said the gunfire "appeared to be close."

{¶26} Further, in *Hairston*, the officers knew exactly where the gunshots had come from, which was a local elementary school. In the present case, the officers did not know exactly where the gunshot had occurred but only that it occurred in a certain radius. The record contains no testimony as to the size of the radius. *See State v. Carter*, 2d Dist. Montgomery No. 29091, 2022-Ohio-91, ¶ 3 (police officer testified that the Spot Shotter system provided a 25-meter (or 82-foot) radius). The only indication in the record of the size of the area to be investigated was that the officers were dispatched to 2528 to 2568 Hansford Place, which was a residential dead-end street, "with a lot of houses and a lot of apartment buildings." Additionally, there was a side street "that goes off of Hansford."

{¶27} In *Hairston*, the officers arrived at the scene in 30 to 60 seconds, which the Ohio Supreme Court said was an important consideration. Here, the officers were about a mile away from Hansford Place when they received the dispatch about the Shot Spotter alert. It was five minutes before the undercover officer arrived at Hansford Place and three more minutes before Officer Wallace and his partner arrived. This court does not hold that the number of minutes that an officer takes to

8

arrive on the scene is dispositive, but only that it is one factor to be considered when looking at the totality of the circumstances.

{¶28} In *Hairston*, the officers, after arriving, saw the defendant walking away from the school, with no one else around. They asked him if he had a weapon, and the defendant told them he had a gun and nodded toward his jacket pocket. In this case, the plain-clothes officer notified Officer Wallace and his partner that there was a man alone at the scene. However, when Wallace arrived, Henson was not alone. Video from Officer Wallace's body camera showed that Henson was placing three young children in the car. Additionally, a woman's voice is heard from inside the car. That Henson's children were present is inconsistent with him firing a gun. Further, the officers never asked him if he had a weapon before conducting the pat-down search.

{¶29} Finally, in *Hairston*, the police officer specifically testified that criminal activity frequently occurred in the area around the school during the evening hours. Here, Officer Wallace stated that that there was a lot of gun activity in the Westwood neighborhood generally, and that there were "a couple pretty well known hot spots in that area that we like to patrol." However, he never specified where those hot spots were or how close he was to them when getting the dispatch.

{¶30} That the officers were in a high-crime area is relevant. The Supreme Court has stated that an officer's experience with criminal activity and an area's reputation for criminal activity are relevant factors in the reasonable-suspicion analysis. *Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.2d 1122, at ¶ 12; *In re J.C.*, 1st Dist. Hamilton Nos. C-180478 and C-180479, 2019-Ohio-4815, at ¶ 17. Further, a stop that occurs after dark is another relevant circumstance "to be of some significance in the reasonable-suspicion analysis." *Hairston* at ¶ 12; *In re J.C.* at ¶ 17.

{¶31} But "an individual's presence in a high-crime or high-drug area, by itself, is insufficient to justify the stop and frisk of a person, especially when the officer

indicated that the offender did nothing to make him worry that the offender would harm him." *In re J.C.* at ¶ 17. Here, there were no reports of gunfire from the residents of the area, and no description of a person of interest. *See In re D.W.*, 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 32 (2d Dist.); *In re Doane*, 1st Dist. Hamilton No. C-040523, 2005-Ohio-2740, ¶ 13-14. Further, the officers did not observe a bulge in Henson's clothing that would have been indicative of him concealing a weapon, and he made no gestures consistent with having a weapon before the officers decided to conduct the pat-down search. *See State v. Evans*, 67 Ohio St.3d 405, 414-416, 618 N.E.2d 162 (1993); *In re J.C.* at ¶ 22-24; *Billups*, 1st Dist. Hamilton No. C-150500, 2017-Ohio-4309, at ¶ 12.

{¶32} Certainly the Shot Spotter alert gave the officers a justifiable concern for their safety. But the need to act out of concern for officer safety does not legitimize the "indiscriminate stop and frisk" of the first person observed on the scene. *See State v. Stewart*, 193 Ohio App.3d 716, 2011-Ohio-2910, 953 N.E.2d 886, ¶ 15 (8th Dist.).

{¶33} As we have previously stated,

> [W]e fully appreciate the threat police officers face each day, particularly when patrolling neighborhoods prone to gun violence. However, the Fourth Amendment does not permit officers to stop, seize or search any person without corroborating information that the person in question is involved in criminal activity.

*In re J.C.*, 1st Dist. Hamilton Nos. C-180478 and C-189479, 2019-Ohio-4815, at ¶ 25. To hold otherwise would be to give police officers free reign to stop and search any individual in high-crime neighborhoods, which the Fourth Amendment does not allow. *See Warren*, 129 Ohio App.3d at 605, 718 N.E.2d 936.

**{¶34}** In sum, we hold that under the totality of the circumstances, the police officers did not have a reasonable and articulable suspicion that Henson was armed and dangerous, and that those circumstances would not cause a reasonable officer to conclude that his safety was in danger sufficient to justify a pat-down search. Consequently, the trial court did not err in granting Henson's motion to suppress. We overrule the state's sole assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**BOCK, J.**, concurs.
**WINKLER, J.**, dissents.

**WINKLER, J.**, dissenting.

**{¶35}** I agree with the majority that the initial interaction between the police and Henson was a consensual encounter. But the consensual encounter became a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), when the officers decided to conduct the pat-down search for weapons. The trial court granted the motion to suppress because it found there was a "bad *Terry* stop." The state appeals, arguing that both the stop and the pat-down search for weapons were justified under the Fourth Amendment. Because I would hold that the police officers had an objectively reasonable suspicion that Henson might have been involved in criminal activity and armed and dangerous sufficient to justify the stop and the pat-down search, I respectfully dissent from the majority opinion.

**{¶36}** An investigative stop is a seizure within the meaning of the Fourth Amendment that must be supported by objective justification. *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991); *State v. Lopez*, 166 Ohio App.3d 337, 2006-Ohio-2091, 850 N.E.2d 781, ¶ 13 (1st Dist.). In determining the propriety of Officer Wallace's conduct, we must analyze (1) the investigatory stop and (2) the protective search. *See Andrews* at 87. The analysis is governed by the standards set forth in *Terry* and its progeny. *Id.*

**{¶37}** In *Terry*, the United States Supreme Court held that a police officer may perform an investigative stop when the officer has a reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-3210, 140 N.E.3d 577, ¶ 19; *Andrews* at 87. The police officers must point to specific and articulable facts that, taken together with the rational inferences from those facts, reasonably warrant that intrusion. *Andrews* at 87; *State v. Houston*, 1st Dist. Hamilton No. C-190598, 2020-Ohio-5421, ¶ 57. The standard is objective: would the facts available to the officers at the moment of the seizure have warranted an individual of reasonable caution in the belief that the action taken was appropriate? *Andrews* at 87; *Houston* at ¶ 57.

**{¶38}** A police officer may frisk a detainee's outer clothing for concealed weapons when the officer has a reasonable suspicion that the suspect is armed and dangerous. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24, 88 S.Ct. 1868, 20 L.Ed.2d 889. An officer need not be certain that a detainee is armed, but the officer's suspicion about the presence of a weapon must be reasonably aroused to conduct a protective search. *Id.* at 27; *State v. Thompson*, 1st Dist. Hamilton No. C-050400, 2006-Ohio-4285, ¶ 8.

**{¶39}** A determination that reasonable suspicion exists "need not rule out the possibility of innocent conduct." *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 22, quoting *United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). In permitting detentions based on reasonable

suspicion, "*Terry* accepts the risk that officers may stop innocent people." *Hawkins* at ¶ 22, quoting *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S.Ct. 673, 245 L.Ed.2d 570 (2000).

**{¶40}** When reviewing the constitutional propriety of a protective search, a court may, among other factors, consider (1) the surrounding area; (2) the cover of night where weapons can be easily hidden; (3) the arresting officer's experience, knowledge, and observations; and (4) the officer's proximity to protective cover when making the frisk. *Thompson* at ¶ 11.

**{¶41}** In *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, the Ohio Supreme Court held that an appellate court had erred in determining that the defendant's motion to suppress should have been granted. *Hairston's* facts are similar to the facts in this case. Though as the majority points out, there are some distinctions between *Hairston* and this case, I do not believe that those distinctions justify a different result in this case.

**{¶42}** As in *Hairston*, the officers in this case were responding to an alert of shots fired, "an inherently dangerous circumstance beyond general criminality." *State v. Carter*, 2d Dist. Montgomery No. 29091, 2022-Ohio-91, ¶ 55. "[T]he inherent danger of gun violence set[s] shootings apart from other criminal activity." *State v. Rickmon*, 952 F.3d 876, 883 (7th Cir.2020). The right to frisk must be "immediate and automatic" where the lawfully stopped detainee is under suspicion for a crime of violence. *State v. Evans*, 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993).

**{¶43}** As in *Hairston*, the officers were patrolling a high-crime area. Officer Wallace was a member of the Gun Crimes Task Force. He was patrolling in the Westwood neighborhood because it was known to be a high-crime area. Officer

Wallace testified that in that neighborhood there had been "a lot of gun activity * * *." He added that there were "a couple of hot spots in the area that we like to patrol." An officer's experience with criminal activity in an area and an area's reputation for criminal activity are relevant factors in the reasonable-suspicion analysis. *Hairston* at ¶ 12.

{¶44} The officers responded to the scene a short time later. In this case, the plain-clothes officer responded in five minutes, while in *Hairston* the officers responded in 30 to 60 seconds. Cases may arise where that distinction is significant, but under the totality of the circumstances in this case, it is not dispositive.

{¶45} Further, the plain-clothes officer reported that Henson was alone in the area specified in the Shot Spotter alert. While there was no testimony as to the exact radius triangulated by the system in feet or yards, the alert was narrowed down to a small area, specifically 2558 to 2568 Hansford Place, which was a dead-end street.

{¶46} It was dark and raining when the officers arrived at the scene. When Officer Wallace told Henson that he wanted to conduct a pat-down search, Henson became agitated and turned his body away. Nervousness during interactions with the police is a factor to be weighed in determining whether reasonable suspicion exists. *State v. Fisher*, 10th Dist. Franklin No. 10AP-746, 2011-Ohio-2488, ¶ 37.

{¶47} In *Hairston*, the Supreme Court said that the court of appeals "went astray focusing on individual factors in isolation rather than on the totality of the circumstances." *Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.2d 1132, at ¶ 15. I believe the majority has similarly gone astray. "The reasonable-suspicion determination must be based on the *collection* of factors, not on the individual factors

themselves." (Emphasis sic.) *Id.*, quoting *State v. Batchile*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 19.

{¶48} The Supreme Court also said that the court of appeals had erred in refusing to give any weight to the contextual factors asserted by the state. *Hairston* at ¶ 15. The officers were not required to ignore "the relevant characteristics of [the] location in determining whether the circumstances [were] sufficiently suspicious to warrant further investigation." *Id.*, quoting *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673, 145 L.Ed.2d 570. To the contrary, police officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them, which "might well elude the untrained person." *Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, at ¶ 21, quoting *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744, 151 L.Ed.2d 740.

{¶49} Even if none of the factors relied upon by the state were sufficient in and of themselves to create a reasonable suspicion that Henson was involved in criminal activity and that he was armed and dangerous, the totality of those factors, considered through the eyes of a reasonable police officer, arose to that level. *See Hairston* at ¶ 16. Consequently, I would hold that the trial court erred in granting Henson's motion to suppress. I would sustain the state's assignment of error and reverse the trial court's judgment.

Please note:

The court has recorded its own entry on the date of the release of this opinion.