[Cite as *State v. Hammer*, 2023-Ohio-1307.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29454 |
| | : | |
| v. | : | Trial Court Case No. 2020 CR 01113/2 |
| | : | |
| PATRICIA HAMMER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 21, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Attorney for Appellee

MICHAEL HALLOCK, JR., Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant, Patricia Hammer, appeals from her conviction in the Montgomery County Court of Common Pleas after a jury found her guilty of two counts of receiving stolen property and one count of engaging in a pattern of corrupt activity. In support of her appeal, Hammer contends that the trial court erred by failing to suppress statements

she had made to a detective while she was illegally detained in the backseat of a police cruiser. For the reasons outlined below, we find that Hammer's detainment was constitutionally permissible, and we will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On May 29, 2020, a Montgomery County grand jury returned an indictment charging Hammer with one fifth-degree-felony count of theft (value of property $1,000 or more but less than $7,500) in violation of R.C. 2913.02(A)(1), and one fifth-degree-felony count of receiving stolen property (value of property $1,000 or more but less than $7,500) in violation of R.C. 2913.51(A). On June 24, 2020, the grand jury returned a "B" indictment that additionally charged Hammer with one first-degree-misdemeanor count of receiving stolen property in violation of R.C. 2913.51(A) and one second-degree-felony count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1). The indicted charges stemmed from allegations that between January 2017 and June 2020, Hammer and her co-defendant, Ora Donaldson, were involved in a series of trailer and motor vehicle thefts in and around the city of Dayton.

{¶ 3} Hammer pled not guilty to the charges and filed a motion to suppress statements she had made to a detective while she was detained in the backseat of a police cruiser. On October 5, 2020, the trial court held a hearing on Hammer's motion. At the hearing, the State presented testimony from Officer Timmie Batley and Detective Curry Mire of the Dayton Police Department. The following is a summary of the testimony and evidence that was presented at the suppression hearing.

{¶ 4} On April 14, 2020, Ofc. Batley was dispatched to 46 South Monmouth Street in the city of Dayton, Montgomery County, Ohio, in response to a report of two individuals engaging in suspicious activity in an alley behind that address. When Batley arrived at the scene, he observed two individuals sitting in the bed of a Dodge pick-up truck that was parked in the alley. Batley approached the individuals, who were later identified as Hammer and Donaldson. Batley advised Hammer and Donaldson that he was there due to a report of suspicious activity. Batley thereafter asked both Hammer and Donaldson if the truck in which they were sitting belonged to them, and they responded that it belonged to their friend who lived in Middletown. During that time, Batley observed that the truck had a broken passenger window. Batley then asked Hammer and Donaldson for their identification information, which they provided. While providing their identification information, Hammer and Donaldson advised Batley that they had been living in a nearby trailer located at 47 South Jersey Street. Shortly thereafter, two more police officers arrived at the scene.

{¶ 5} After speaking with Hammer and Donaldson, Ofc. Batley checked their identification information using his police cruiser computer; he learned that Hammer and Donaldson each had a suspect locator alert ("SLA") associated with their names. Batley testified that an SLA pops up when another officer wants to speak with an individual regarding a crime that the individual may have committed or a crime that the individual may have knowledge of someone else committing. Batley testified that the SLAs on Hammer and Donaldson indicated that they were wanted for questioning by Det. Mire.

{¶ 6} After observing the SLAs, Ofc. Batley placed Hammer and Donaldson in

separate, locked police cruisers while he called his supervising sergeant regarding the matter. Batley patted Hammer down for officer safety before placing her inside his cruiser unhandcuffed. Batley did not ask Hammer any questions while she was being detained.

{¶ 7} A short time later, Det. Mire arrived at the scene. Mire testified at the hearing that he had placed the SLAs on Hammer and Donaldson based on his investigation of a series of trailer and truck thefts that had occurred in the Dayton area. Specifically, Mire had investigated the theft of a trailer from Falke Drive on February 28, 2020, and had determined that Donaldson was a responsible party. During that investigation, Mire obtained photographs showing the stolen trailer hooked up to the truck that was used during the theft. Mire testified that the photographs showed Hammer sitting in the passenger seat of the truck.

{¶ 8} Det. Mire also investigated the theft of a trailer from a company called Oberwerk on Wayne Avenue that had occurred sometime between February 28 and March 3, 2020. While investigating that theft, Mire obtained a video showing the stolen trailer hooked up to a truck owned by Donaldson. According to Mire, the video also showed Hammer sitting in the passenger seat of the truck.

{¶ 9} Det. Mire further investigated the theft of a trailer and some scrap metal from Leo Street that had occurred at the end of March 2020. Mire testified that the truck that was used during the theft had been stolen from Donaldson's previous employer. During that investigation, Mire obtained a video showing both Donaldson and Hammer with the stolen truck.

**{¶ 10}** After placing the SLAs on Hammer and Donaldson, on April 14, 2020, Det. Mire was contacted by Sergeant King, who advised him that Hammer and Donaldson had been located at 46 South Monmouth Street. Mire testified that he told King that he would like Hammer and Donaldson to be detained so that he could respond to the scene and question them. Mire testified that he arrived at the scene within 15 minutes of receiving King's call.

**{¶ 11}** Upon arriving at the scene, Det. Mire saw a truck parked in the alley behind 46 South Monmouth Street. Before speaking with Hammer, Mire checked the truck's license plate and determined that the plate did not belong to the truck. Mire also noticed that the truck had a peeled column, which he explained was a frequently used method of stealing older-model pick-up trucks. Mire then checked the truck's vehicle identification number ("VIN") through Ohio's LEADS[1] database and determined that the truck had been stolen from Harrison Township. Mire also spoke with a witness at the scene who described seeing two individuals with a trailer in the area. Mire testified that he believed those individuals were Hammer and Donaldson.

**{¶ 12}** After his initial investigation at the scene, Det. Mire made contact with Hammer while she was seated in the back of Ofc. Batley's police cruiser. The police cruiser was equipped with a camera that recorded Mire's conversation with Hammer. The video recorded conversation was admitted into evidence as State's Exhibit 1, and it established that Mire read Hammer her *Miranda* rights before he asked her any questions.

---

[1] "LEADS" stands for law enforcement automated data system. It is a "statewide computerized network which provides computerized data and communications for criminal justice agencies within the state of Ohio." Ohio Adm.Code 4501:2-10-01(W).

Mire testified that he read the *Miranda* rights from a card issued to him by the prosecutor's office. The card was also admitted into evidence as State's Exhibit 2.

{¶ 13} After Det. Mire advised Hammer of her *Miranda* rights, Hammer indicated that she understood her rights and began to speak with Mire. However, a few minutes into their conversation, Hammer advised Mire that she wanted to speak with an attorney. At that point, Mire terminated the interview and did not ask Hammer any further questions. Mire had no further contact with Hammer.

{¶ 14} After considering the foregoing testimony and evidence, on December 15, 2020, the trial court overruled Hammer's motion to suppress. In so holding, the trial court found that Hammer's detainment in the back of Ofc. Batley's police cruiser had been constitutionally permissible. Specifically, the trial court found that Mire's knowledge about Hammer and Donaldson's involvement in the series of trailer and truck thefts had provided probable cause to detain Hammer, and that said knowledge could be imputed to Batley once Batley became aware of the SLAs. The trial court also found that Hammer's pre-detainment statements to Batley were admissible because they were not made during a custodial interrogation that required *Miranda* warnings. The trial court further found that Hammer's post-detainment statements to Mire were admissible because Mire had advised Hammer of her *Miranda* rights, which the trial court found Hammer knowingly, intelligently, and voluntarily had waived.

{¶ 15} Following the trial court's ruling on Hammer's motion to suppress, the matter proceeded to a jury trial. Based on the testimony and evidence presented at trial, the jury found Hammer guilty of the first-degree-misdemeanor count of receiving stolen

property, one fifth-degree-felony count of receiving stolen property, and the single count of engaging in a pattern of corrupt activity. Thereafter, the trial court sentenced Hammer to an aggregate, indefinite term of two to three years in prison.

{¶ 16} Hammer now appeals from her conviction, raising a single assignment of error for review.

**Assignment of Error**

{¶ 17} Under her sole assignment of error, Hammer contends that the trial court erred by overruling her motion to suppress. Specifically, Hammer claims that she was illegally seized in violation of her Fourth Amendment rights when Ofc. Batley detained her in the backseat of his police cruiser for questioning by Det. Mire. We disagree.

*Standard of Review*

{¶ 18} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court,

whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*Relevant Fourth Amendment Principles*

{¶ 19} "The Fourth Amendment to the United States Constitution, and Section 14, Article I of the Ohio Constitution, protect individuals from unreasonable searches and seizures conducted by police officers." (Citations omitted.) *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, ¶ 12. The Fourth Amendment, however, is not implicated every time a police officer has contact with a citizen. *State v. Taylor*, 106 Ohio App.3d 741, 747, 667 N.E.2d 60 (2d Dist.1995), citing *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). "The United States Supreme Court has identified three categories of police-citizen contact to identify situations where the Fourth Amendment protections are implicated." *State v. Crum*, 2d Dist. Montgomery No. 22812, 2009-Ohio-3012, ¶ 12, citing *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). (Other citation omitted.) These categories are: (1) consensual encounters; (2) investigatory detentions; and (3) seizures that are the equivalent of an arrest. *Taylor* at 747-749.

{¶ 20} "Consensual encounters are not seizures, and Fourth Amendment guarantees are not implicated in such encounters." *State v. Keister*, 2d Dist. Montgomery No. 29081, 2022-Ohio-856, ¶ 27, citing *Taylor* at 747-749, citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "Consensual encounters occur when the police merely approach a person in a public

place and engage the person in conversation, and the person remains free not to answer and to walk away." *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *Mendenhall* at 553. Therefore, "[a] consensual encounter can occur when a police officer approaches and questions individuals in or near a parked car." (Citations omitted.) *State v. Schott*, 2d Dist. Darke No. 1415, 1997 WL 254141, *3 (May 16, 1997); *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, ¶ 20 (10th Dist.) Moreover, "[t]he request to check a person's identification does not make the encounter nonconsensual; nor does the request to check one's belongings." (Citation omitted.) *Crum* at ¶ 14. *Accord State v. Morris*, 2d Dist. Clark No. 2021-CA-31, 2022-Ohio-94, ¶ 20. "Only once a person's liberty has been restrained has the encounter lost its consensual nature and falls into a separate category beyond the scope of a consensual encounter." (Citations omitted.) *Crum* at ¶ 14.

{¶ 21} "Unlike consensual encounters, an investigatory detention constitutes a seizure; therefore, Fourth Amendment protections are implicated in an investigatory detention." (Citations omitted.) *State v. Shern*, 2018-Ohio-5000, 126 N.E.3d 322, ¶ 13 (2d Dist.). "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions." *Lewis* at ¶ 22, citing *Mendenhall* at 553 and *Terry v. Ohio,* 392 U.S. 1, 16 and 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). During investigatory detentions, "police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable

suspicion that criminal activity may be afoot[.]" *State v. Swift*, 2d Dist. Montgomery No. 27036, 2016-Ohio-8191, ¶ 10, citing *Terry*. (Other citations omitted.) Therefore, "[i]nvestigatory detentions do not violate the Fourth Amendment "as long as the police have a reasonable, articulable suspicion of criminal activity." *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 22, citing *Taylor*, 106 Ohio App.3d at 748-749, 667 N.E.2d 60, citing *Terry* at 21.

{¶ 22} Unlike investigatory detentions, a seizure that is the equivalent of an arrest is constitutionally permissible "only if the police have probable cause to arrest a person for a crime." *State v. Retherford*, 93 Ohio App.3d 586, 595, 639 N.E.2d 498 (2d Dist.1994), citing *Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. "Probable cause to arrest exists when a reasonably prudent person would believe that the person to be arrested has committed a crime." *State v. Adams*, 2d Dist. Montgomery No. 24184, 2011-Ohio-4008, ¶ 7, citing *State v. Timson*, 38 Ohio St.2d 122, 311 N.E.2d 16 (1974). "A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 66.

{¶ 23} Whether a law enforcement officer possessed probable cause or reasonable suspicion to detain an individual must be examined in light of the totality of the circumstances viewed from the standpoint of an objectively reasonable police officer. *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991); *State v. Short*, 2d Dist. Montgomery No. 27712, 2018-Ohio-3202, ¶ 19-20; *State v. Cromes*, 3d Dist. Shelby No. 17-06-07, 2006-Ohio-6924, ¶ 38, citing *United States v. Arvizu*, 534 U.S. 266, 273, 122

S.Ct. 744, 151 L.Ed.2d 740 (2002). "This 'typically requires [a showing] that the officer making the stop [or arrest] was [personally] aware of sufficient facts to justify it[.]' " *State v. Pickett*, 2017-Ohio-5830, 94 N.E.3d 1046, ¶ 9 (2d Dist.), quoting *City of Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999).

{¶ 24} The collective knowledge doctrine, however, "permits police officers to rely on information provided to them by other officers in helping to establish probable cause or reasonable suspicion." (Citations omitted.) *State v. Jones*, 2d Dist. Montgomery No. 23926, 2011-Ohio-1984, ¶ 20. " 'Reasonable suspicion [or probable cause] may exist based upon the collective knowledge of the police when there is reliable communication between the officer supplying the information and the officer acting on that information.' " *State v. Freeman*, 9th Dist. Summit No. 27617, 2015-Ohio-2501, ¶ 16, quoting *State v. Mook*, 9th Dist. Wayne No. 97CA0069, 1998 WL 417461, *3 (July 15, 1998). More specifically, " 'vertical collective knowledge' * * * involves situations where one officer has probable cause [or reasonable suspicion] and instructs another officer to act, but does not communicate the corpus of the information known to the first officer that would justify the action." *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 32 (2d Dist.), quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir.2008). Under such circumstances, the State must show that the officer who provided the information had a valid reasonable suspicion of criminal activity or sufficient facts adding up to probable cause. *State v. Wortham*, 145 Ohio App.3d 126, 130, 761 N.E.2d 1151 (2d Dist.); *State v. Sabo*, 6th Dist. Lucas No. L-08-1452, 2009-Ohio-6979, ¶ 23.

*State v. Armstead*

{¶ 25} In support of her appeal, Hammer relies on this court's decision in *State v. Armstead*, 2015-Ohio-5010, 50 N.E.3d 1073 (2d Dist.). Hammer cites *Armstead* for the proposition that her detention in Ofc. Batley's police cruiser violated the Fourth Amendment because the detention was based solely on the SLA issued by Det. Mire and not any reasonable suspicion of criminal activity or probable cause stemming from her interaction with Ofc. Batley. Hammer claims that, based on *Armstead*, any reasonable suspicion of criminal activity or probable cause to arrest that Mire may have had based on his investigation of the trailer and truck thefts was irrelevant to her detention by Batley because Batley did not know anything about Mire's investigation or the reason behind the SLA. While *Armstead* does support this proposition, for the reasons discussed below, we find that the legal analysis in *Armstead* is flawed and expressly overrule it.

{¶ 26} In *Armstead*, two Dayton police officers conducted a traffic stop of a vehicle for a turn signal violation in January 2014. *Id.* at ¶ 2-3. During the traffic stop, one of the officers made contact with the driver of the vehicle and the other officer made contact with the sole passenger, Glen Armstead. *Id.* at ¶ 3. The officer who made contact with Armstead obtained Armstead's identification information and checked that information on his police cruiser computer. *Id.* In doing so, the officer discovered that Armstead did not have any warrants but did have an SLA associated with his name. *Id.* The SLA had been issued by a detective who wanted a sample of Armstead's DNA. *Id.* at ¶ 4. Other than the need for the DNA sample, the officer at the traffic stop did not know why the detective wanted to speak with Armstead. *Id.* at ¶ 6.

{¶ 27} The detective who issued the SLA testified that the SLA was related to a prior hit and run accident that he had been assigned to investigate in December 2012. *Id.* at ¶ 8-9. During that investigation, the police had found mail bearing Armstead's name and address inside the vehicle involved in the hit and run. *Id.* at ¶ 8. In addition, the police had received an anonymous tip that Armstead had been involved in the accident. *Id.* The detective, however, was unable to locate Armstead and placed an SLA on Armstead's file. *Id.* at ¶ 9.

{¶ 28} When the officer at the January 2014 traffic stop noticed the SLA, he directed Armstead to exit the vehicle and conducted a pat-down search of Armstead's person. *Id.* at ¶ 5. The officer then informed Armstead that he needed to come with him in order to speak with a detective at the police department's safety building. *Id.* at ¶ 6. The officer thereafter placed Armstead in the rear of his locked police cruiser and contacted the detective who had issued the SLA. *Id.* In doing so, the officer did not draw his weapon or handcuff Armstead. *Id.* at ¶ 5.

{¶ 29} The officer testified that Armstead was not under arrest at that time and that he did not have probable cause to request an arrest warrant for Armstead. *Id.* at ¶ 6. The officer also testified that Armstead was free to leave, but that he had never informed Armstead of that fact. *Id.* The officer also never advised Armstead that he was under arrest and made no attempt to explain the SLA to Armstead. *Id.* at ¶ 25. The officer simply told Armstead that a detective wanted to speak with him and thereafter placed Armstead in a locked police cruiser and took him to the safety building to be interviewed. *Id.* The officer testified that if Armstead had refused to go to the safety building, he could

not have compelled Armstead to do so. *Id*. at ¶ 6.

**{¶ 30}** The record did not contain any evidence indicating that Armstead had consented to going to the safety building with the officer. *Id*. The officer nevertheless transported Armstead to the safety building where Armstead was interviewed by the detective who had issued the SLA. *Id*. at ¶ 10. The detective read Armstead his *Miranda* rights, and Armstead answered approximately five questions before terminating the interview. *Id*. at ¶ 11. The officers thereafter released Armstead. *Id*.

**{¶ 31}** A few weeks after his release, Armstead was indicted for one count of failure to stop after an accident where said accident resulted in serious harm or death to a person, in violation of R.C. 4549.02(A), a felony of the fifth degree. *Armstead*, 2015-Ohio-5010, 50 N.E.3d 1073, at ¶ 12. Armstead thereafter filed a motion to suppress the statements he had made to the detective on grounds that the statements had been obtained during an unlawful arrest that violated his Fourth Amendment rights. *Id*. at ¶ 13. The trial court agreed with Armstead and sustained his motion to suppress. *Id*. at ¶ 14. The State thereafter appealed. *Id*. at ¶ 15.

**{¶ 32}** On appeal, this court found that Armstead's detainment was the functional equivalent of an arrest because "a reasonable person in Armstead's position would have understood that he was in custody and not free to leave." *Id*. at ¶ 25. As a result, this court concluded that the officer who had seized Armstead and transported him to the safety building needed to have probable cause in order for the seizure to be constitutionally permissible. *Id*.

**{¶ 33}** When analyzing whether probable cause existed, this court acknowledged

that the trial court had found that the detective who issued the SLA had probable cause

in 2012 to obtain an arrest warrant for Armstead regarding the hit and run offense.[2]    *Id.*

---

[2]  Despite finding probable cause, the trial court in *Armstead* sustained Armstead's motion to suppress because the trial court incorrectly held that even if probable cause existed, an arrest must also be based on exigent circumstances.   In reaching that decision, the trial court relied on *State v. Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, (2d Dist.), wherein this court held that: "A warrantless arrest is permitted when two requirements have been met: first, the officer must have probable cause for the arrest; second, obtaining an arrest warrant beforehand must be shown to have been impracticable under the circumstances."   *Id.* at ¶ 12.   The holding in *Jones*, however, was based on *State v. Heston*, 29 Ohio St.2d 152, 280 N.E.2d 376 (1972), and *State v. Woodards*, 6 Ohio St.2d 14, 215 N.E.2d 568 (1966), two cases that were decided prior to *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).   In *Watson*, the United States Supreme Court held that the failure to obtain a warrant to make an arrest in a public place, absent exigent circumstances, does not violate the Fourth Amendment if the arrest is supported by probable cause.   *Id.* at 423-424.   Relying on *Watson*, the Supreme Court of Ohio has also held that: "A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment."   *Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, at ¶ 66. Therefore, the trial court's reliance on *Jones* in *Armstead* was improper because the holding in *Jones* was based on authority that had been discredited by prior decisions of the United States Supreme Court and the Supreme Court of Ohio.   We also note that in *State v. Jordan*, 166 Ohio St.3d 339, 2021-Ohio-3922, 185 N.E.3d 1051, the Supreme Court of Ohio rejected the holding in *Jones*, which this court cited in *State v. VanNoy*, 188 Ohio App.3d 89, 2010-Ohio-2845, 934 N.E.2d 413 (2d Dist.).   Specifically, the Supreme Court of Ohio stated the following in *Jordan*:

> [T]he Second District Court of Appeals has held, albeit inconsistently, that not only must a warrantless arrest be supported by probable cause to pass constitutional muster, but "it must also be shown that obtaining an arrest warrant beforehand was impracticable under the circumstances, i.e., that exigent circumstances exist."   *State v. VanNoy*, 188 Ohio App.3d 89, 2010-Ohio-2845, 934 N.E.2d 413, ¶ 23 (2d Dist.), citing *State v. Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, ¶ 12 (2d Dist.), citing *Heston*, 29 Ohio St.2d 152, 280 N.E.2d 376, at paragraph two of the syllabus, and *Woodards,* 6 Ohio St.2d 14, 215 N.E.2d 568. *But see State v. Short*, 2d Dist. Montgomery No. 27712, 2018-Ohio-3202, ¶ 18, quoting *Brown* at ¶ 66 (a " 'warrantless arrest that is based upon probable cause and occurs in public does not violate the Fourth Amendment' "). For the reasons already stated in this opinion, we reject the Second District's holding in *VanNoy* as contrary to precedent from both this court and the United States Supreme Court.

*Jordan* at ¶ 29.

at ¶ 26. This court nevertheless found that the existence of probable cause from the 2012 hit-and-run investigation was irrelevant to the traffic stop seizure at issue, because the officer who performed the seizure did not know anything about the alleged hit and run offense or why the investigating detective wanted to speak with Armstead. *Id.* Accordingly, this court held that Armstead had been illegally seized without probable cause, without a warrant, and without any applicable exigent circumstances. *Id.* at ¶ 27. That holding was flawed.

{¶ 34} As discussed in the dissenting opinion in *Armstead*, this court "fail[ed] to consider the established concept that probable cause to arrest may be based on the collective knowledge of the police." *Armstead*, 2015-Ohio-5010, 50 N.E.3d 1073, at ¶ 42 (Welbaum, J., dissenting), citing *Jones*, 2d Dist. Montgomery No. 23926, 2011-Ohio-1984, ¶ 20, *Wortham*, 145 Ohio App.3d 126,130, 761 N.E.2d 1151, and *State v. Sellers*, 2d Dist. Montgomery No. 26121, 2014-Ohio-5366, ¶ 19. Indeed, the facts of *Armstead* indicate that the officer who detained Armstead during the traffic stop was working in concert with the detective who issued the SLA. Accordingly, "[a]n arrest warrant was not required to lawfully detain Armstead because the officers collectively were aware of facts supporting probable cause to arrest for a felony offense, and the arrest was made in a public place." *Id.* at ¶ 44; *Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, at ¶ 66 ("[a] warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment").

{¶ 35} *Armstead* also incorrectly relied on the fact that the officer at the traffic stop testified that he did not have probable cause to arrest Armstead. *See Armstead* at ¶ 26.

"Whether [the] officer subjectively believed he had probable cause to arrest is irrelevant, because 'a probable cause determination must be viewed under an objective standard, not a subjective standard.' " *Id.* at ¶ 45, quoting *State v. McDonald*, 4th Dist. Washington No. 04CA7, 2004-Ohio-5395, ¶ 25. Therefore, " 'a court is not bound by an officer's subjective conclusions concerning the existence of probable cause and may determine that an officer possessed probable cause even if the officer did not believe that the probable cause standard had been satisfied[.]' " *Id.*, quoting *State v. Hansard*, 4th Dist. Scioto No. 07CA3177, 2008-Ohio-3349, ¶ 36.

{¶ 36} In *Armstead*, this court should have applied the collective knowledge doctrine and conducted an objective evaluation to determine whether probable cause existed from the collective knowledge of all the officers who were working in conjunction on the investigation. When doing so, we find that Armstead's seizure was supported by probable cause. This is because the knowledge of the hit-and-run offense possessed by the detective who issued the SLA could be imputed to the officer who seized Armstead at the traffic stop per the detective's request. Therefore, the holding in *Armstead* concluding that Armstead's seizure was an illegal arrest because it was without probable cause was legally incorrect and is hereby overruled. Having been overruled, *Armstead* has no bearing on the outcome of Hammer's appeal.

*Hammer's Encounter with Police and Subsequent Detention*

{¶ 37} Upon review, we find that Hammer's initial encounter with Ofc. Batley was consensual and did not implicate any Fourth Amendment concerns; the record indicates

that Batley simply walked up to Hammer and asked her some questions while she was sitting in the bed of a pick-up truck parked in an alley. As previously discussed, "[a] consensual encounter can occur when a police officer approaches and questions individuals in or near a parked car." (Citations omitted.) *Schott*, 2d Dist. Darke No. 1415, 1997 WL 254141, at *3; *Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, at ¶ 20. The fact that. Batley requested Hammer's identification information did not make the encounter nonconsensual. *See Crum*, 2d Dist. Montgomery No. 22812, 2009-Ohio-3012, at ¶ 14; *Morris*, 2d Dist. Clark No. 2021-CA-31, 2022-Ohio-94, at ¶ 20.

{¶ 38} Ofc. Batley's encounter with Hammer remained consensual until he observed the SLA associated with Hammer's name. At that point, Batley patted Hammer down and placed her in the backseat of his locked police cruiser unhandcuffed so that he could contact his supervising officer regarding the SLA. Under these circumstances, a reasonable person in Hammer's position would not have felt free to leave given that she was locked inside the police cruiser awaiting questioning. Accordingly, we find that Hammer was seized for Fourth Amendment purposes once she was placed in Batley's cruiser. *See State v. Williams*, 2d Dist. Montgomery No. 15682, 1996 WL 741807, *3 (Dec. 13, 1996) (seizure occurred when police officer asked defendant to sit inside her cruiser for further questioning); *State v. Collier*, 2d Dist. Clark No. 2018-CA-104, 2019-Ohio-3197, ¶ 33 ("A 'seizure' requires either 'some application of physical force' or 'a show of authority to which the subject yields.' "), quoting *State v. Franklin*, 2d Dist. Montgomery No. 15875, 1997 WL 476693, *2 (Aug. 22, 1997), citing *Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690.

{¶ 39} Upon review, we find that Hammer's seizure was constitutionally permissible because it was based on probable cause that existed from the collective knowledge of all the officers. The record indicates that Det. Mire had previously investigated several thefts of trailers and trucks in the Dayton area for which Hammer had been a suspect. During his investigation, Mire obtained photographs and videos showing Hammer seated in the stolen trucks and in trucks attached to the stolen trailers. Mire also knew that Hammer was associated with Donaldson, who Mire knew was involved with the thefts. All this information provided Mire with probable cause to arrest Hammer.

{¶ 40} When Ofc. Batley came across Det. Mire's SLA on Hammer, Batley contacted his supervising officer, who then contacted Mire. Upon learning about Hammer's being located, Mire asked that Hammer be detained so that he could question her about the thefts. This is a prime example of "vertical collective knowledge," i.e., where " 'one officer has probable cause and instructs another officer to act, but does not communicate the corpus of the information known to the first officer that would justify the action.' " *Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, at ¶ 32, quoting *Chavez*, 534 F.3d at 1345. Therefore, the probable cause that Mire had concerning Hammer could be imputed to Ofc. Batley when Batley detained Hammer in the back of his police cruiser per Mire's request.

{¶ 41} Although it is unclear from the record whether Det. Mire believed he had probable cause to arrest Hammer, this court "is not bound by an officer's subjective conclusions concerning the existence of probable cause and may determine that an

officer possessed probable cause even if the officer did not believe that the probable cause standard had been satisfied[.]" *Hansard*, 4th Dist. Scioto No. 07CA3177, 2008-Ohio-3349, at ¶ 36. Therefore, the fact that Mire asked to have Hammer detained for questioning as opposed to having her placed under arrest is irrelevant to our analysis.

**{¶ 42}** We also note that, before Det. Mire questioned Hammer, he was able to determine that the pick-up truck Hammer and Donaldson had been sitting in was stolen by observing the truck's peeled column and by checking the truck's VIN on LEADS. Upon learning that the truck was stolen, Mire not only had probable cause with regard to his prior investigation of the stolen trucks and trailers, but he also had probable cause to arrest Hammer for the stolen truck in the alley behind 46 South Monmouth Street.

**{¶ 43}** For all the foregoing reasons, we find no Fourth Amendment violation with respect to Hammer's warrantless seizure and therefore overrule her sole assignment of error.

## Conclusion

**{¶ 44}** Having overruled Hammer's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

EPLEY, J. and HUFFMAN, J., concur.