[Cite as *State v. Gipp*, 2024-Ohio-1076.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 29983 |
| | : | |
| v. | : | Trial Court Case No. 23 CRB 2642 |
| | : | |
| STEVEN GIPP, JR. | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 22, 2024

. . . . . . . . . . .

MARC T. ROSS, Attorney for Appellant

KAILA L. MCCLELLAN, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} The State appeals from the trial court's order granting Steven Gipp Jr.'s motion to suppress evidence. Because we conclude that police officers had a reasonable belief that Gipp had committed domestic violence when they arrested him, the trial court's judgment will be reversed, and the matter will be remanded for further

proceedings.

## FACTS AND PROCEDURAL HISTORY

**{¶ 2}** On July 17, 2023, Gipp was charged by complaint with obstructing official business and resisting arrest. The events giving rise to Gipp's arrest occurred earlier that day when J.S., Gipp's former girlfriend and the mother of his child, reported that Gipp had committed domestic violence against her at his home on Hamilton Avenue. After Officer Green met with J.S. at a different location, he instructed Officers Lyons and Moreland, who were on patrol close to Gipp's residence, to arrest Gipp for "domestic violence/threats." Gipp did not cooperate when the officers attempted to arrest him, which led to the charges of obstructing official business and resisting arrest.

**{¶ 3}** The matter was scheduled for trial on September 11, 2023, and then reset for September 18, 2023. On September 12, 2023, Gipp filed a motion to suppress the evidence related to obstructing and resisting arrest on the basis that his arrest had been "based on neither probable cause nor a duly executed arrest warrant." A hearing on the motion to suppress occurred on September 18, 2023; the three officers involved in Gipp's arrest testified. The court granted Gipp's motion to suppress on November 22, 2023, concluding that the officers had lacked probable cause to arrest him.

**{¶ 4}** The State appeals.

## ASSIGNMENT OF ERROR AND ANALYSIS

**{¶ 5}** The State asserts the following assignment of error:

THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION

TO SUPPRESS EVIDENCE.

{¶ 6} According to the State, the trial court failed to follow R.C. 2953.03(B) in sustaining Gipp's motion to suppress. The State asserts that the trial court's findings of fact were against the manifest weight of the evidence based upon improper inferences and conclusions "beyond the actual evidence introduced" at the suppression hearing.

{¶ 7} Gipp responds that the trial court did not err in granting his motion to suppress. He asserts that R.C. 2935.03, which allows a law enforcement officer to arrest and detain a person found violating a law until a warrant can be obtained, does not lower the constitutional standard of probable cause for arrest. He also asserts that the officers' alleged good faith in this case should not lower the probable cause requirement. Gipp argues that R.C. 2935.03 "does not nullify the Fourth Amendment" and that the General Assembly does not have the authority to override constitutions protections.

{¶ 8} According to Gipp, J.S.'s version of events was difficult to follow and unverified at the time of his arrest, and the Constitution requires more than "unreliable, uncorroborated allegations" before a citizen can be deprived of his or her liberty. Gipp emphasizes that an arrest without probable cause is per se unreasonable under the Fourth Amendment. Gipp further asserts that the good faith exception only applies to an officer's reliance on a warrant issued by a judge or magistrate; "it does not apply to the reliance of a statute [sic], and it does not apply to warrantless arrests."

{¶ 9} In reply, the State asserts that the "reasonable ground" to arrest and detain for an offense of violence referenced under R.C. 2935.03(B) must mean something different than probable cause "or else the legislature simply would have used the words 'probable cause.'" The State cites *State v. O'Neill,* 2015-Ohio-815, 29 N.E.3d 365 (3d

Dist.), a domestic violence case, which held that the "reasonable grounds" enumerated in R.C. 2935.03(B)(3)(a)(i) and (ii) expressly permit an officer to find probable cause in circumstances where the officer may not have witnessed the suspect committing a domestic violence offense. Regarding the good faith exception, the State argues that courts have applied it to cases in which officers reasonably relied in good faith on statutes to make arrests and such statutes were later found to be unconstitutional. According to the State, the officers in this case "reasonably relied in good faith on R.C. 2935.03(B) and department policy" in effectuating Gipp's arrest, and "any evidence obtained in effectuating that arrest, including testimony and evidence that [Gipp] resisted or obstructed," should not have been suppressed.

{¶ 10} At the hearing on the motion to suppress, the State initially argued that Gipp's motion to suppress was untimely and also that the basis for the motion, namely that there had not been probable cause for his arrest, was an issue for trial. The State further asserted that there was no evidence obtained as a result of the arrest that was subject to suppression. Gipp's attorney responded that if the arrest was "bad," then any evidence obtained as a result of it should be suppressed, including the testimony of the officers who were involved and any evidence that Gipp had resisted arrest or obstructed official business.

{¶ 11} The trial court concluded that, although the motion to suppress was untimely filed less than seven days before trial, it would hear the motion "in the interest of justice."

{¶ 12} The evidence at the suppression hearing was as follows.

**{¶ 13}** Dayton Police Officer William Green testified that on July 17, 2023, he was dispatched on a domestic violence call involving Gipp. The complainant was Gipp's former girlfriend and the mother of his child, J.S., who was at an address on Valerie Arms Drive, and Green met her there. J.S. reported to Green that Gipp had threatened to harm her at his home on Hamilton Avenue, where he lived with his mother. J.S. advised Green that Gipp told her, "Come on out here so I can hit you in your s***," and that he picked up a plastic child's basketball hoop and made a motion like he was going to swing it at her before his mother interrupted him.

**{¶ 14}** After speaking to J.S., Green contacted Officers Moreland and Lyons, who were closer to the Hamilton Avenue address than Green was. Green informed the other officers that he had "a domestic violence/threats charge" on Gipp. Green gave them the Hamilton Avenue address and asked them to speak with Gipp, get his side of the story, "and make an arrest" for "domestic violence/threats." Green then completed the domestic violence victim's packet with J.S. per department policy. According to Green, because J.S. and Gipp had a child in common, "it would count as a domestic violence charge," and Gipp had threatened to strike J.S., which she took "as a legitimate threat." Green testified that J.S. had believed Gipp was trying to hit her with the basketball hoop and had been afraid he would do so. He further stated that the domestic violence victim's packet includes a written witness statement; J.S. "filled out a few lines of her own experience" and signed it. Pursuant to department policy, Green advised J.S. to speak to the prosecutor the following day and then proceeded to the Hamilton Avenue address with the packet to see what the other officers had done.

**{¶ 15}** When Green arrived at the Hamilton Avenue address, Moreland and Lyons had already arrested Gipp and placed him in their cruiser; the officers advised Green that Gipp had resisted arrest. According to Green, pursuant to department policy, if officers have reasonable grounds to believe "that domestic violence has occurred against a person, then we make an arrest." Green indicated that he had contacted the other officers to effectuate Gipp's arrest because they were closer to Gipp's location and it was "best to do it in as an expedient manner as possible."

**{¶ 16}** On cross-examination, Green acknowledged that J.S. had advised him that she went to Gipp's address to confront him prior to the incident which resulted in Gipp's arrest and also that his report mentioned that J.S.'s story had been difficult to follow. Green also testified that the domestic violence packet used with J.S. included a domestic violence checklist for his observations and a lethality screen, in addition to the section for a witness statement. Green acknowledged that he had recorded negative responses on the domestic violence checklist, indicating that he made no physical or behavioral observations, no emotional observations (such as crying), and reported no injuries, signs of physical abuse, or signs of alcohol or drug use. When Green completed the lethality screen with J.S., she indicated that there was nothing that concerned her about her safety other than what had already transpired with Gipp. On redirect examination, Green clarified that, on the lethality screen, J.S. answered affirmatively that she felt Gipp might try to kill her, that she had left him after living with him, that Gipp was violently or constantly jealous or monitored her daily activities, that he followed her or left her threatening messages, and that he was unemployed.

{¶ 17} Officer Robert Lyons testified that, on the day in question, Green advised him that he had "a good domestic violence/threats charge" on Gipp and asked if he and his partner would try to find Gipp. Lyons testified that he did not specifically discuss with Green whether Green had completed a domestic violence packet but that they "trust each other" on such issues. Lyons then met Gipp and his mother at the Hamilton Avenue address and told Gipp that he wanted to gather some information about "a situation" between Gipp and J.S., without telling Gipp "right then and there" that he was under arrest. According to Lyons, without prompting, Gipp's first statement was that he "didn't * * * even hit" J.S. Lyons and Moreland told Gipp that J.S. alleged that he had threatened to harm her and that he was going to be under arrest for the threats. Gipp then obstructed official business and resisted arrest, as demonstrated by Lyons's body camera video, which was played for the court. According to Lyons, Gipp denied putting his hands on J.S. but he did not deny or admit to threatening her.

{¶ 18} On cross-examination, Lyons stated that Gipp's arrest had been based upon instructions he received from Green; Lyons indicated that Green had advised that "we would have what's called a broadcast put out for [Gipp] * * * for his arrest * * * which means, if he was going to be putting that out that it would be a good arrest going forward." Lyons was asked by the court whether the officers would have arrested Gipp regardless of his side of the story or anything Gipp's mother told them; he responded that they were going to arrest him based on Ohios' being a "preferred [arrest] State" and J.S. being the one who called the police, but he also stated that if Gipp had presented the officers "with evidence and not just verbal statements" stating that he had not done it, the officers would

have reconsidered and conferred with Green about how to move forward. According to Lyons, "once we put hands on him, he was under arrest and maybe a little bit prior to that."

**{¶ 19}** Officer Eli Moreland testified that Green had advised him and Lyons that Gipp had "actually threatened [J.S.'s] life or threatened physical harm towards her." Moreland's body camera video was also played for the court. As he approached Gipp after advising him that he was going to be taken to jail, Gipp stood up, made a motion toward his mom, and then grabbed onto her. Moreland explained that, under state law as well as Dayton Police Department Policy, it is the "preferred action" that if officers have reasonable grounds that domestic violence has actually occurred, "it is our duty to make that arrest." According to Moreland, Gipp repeatedly denied hitting J.S., and that "raised some red flags" for Moreland, because Gipp did not deny threatening J.S.

**{¶ 20}** The trial court sustained Gipp's motion to suppress. The court discussed the evidence in the body camera videos of Officers Lyons and Moreland as follows:

The videos show [Gipp] telling the Officers that he gets his son every Friday, [J.S.] came to his house and said she needed to go to work, he told her to go to work, and then she hit him. He yelled downstairs to his mother that [J.S.] just hit him on the back of his neck, and he was not about to do this with her because he already knew where they would send him. [J.S.] then said that she was going to call the police on him because he hit her. The Officers inform [Gipp] that [J.S.] was not claiming that he hit her, she was claiming that he made threats towards her. [Gipp] responded by saying

that he asked [J.S.] why she came to his house and hit him and told her that he could hit her back if he wanted to but did not because he knew the consequences, where he would go, and he did not want to do that. He then tells the Officers that [J.S.] said that she was going to see him go to jail. [Gipp's] mother corroborated what he told the officers.

{¶ 21} The court noted that Gipp was not advised that he was under arrest or of the charge, but that the officers told him that Ohio was a "preferred arrest state, and it was violent threats." The court noted that Gipp denied touching J.S. and that his mother agreed that he did not do so. It was significant to the court that Green testified that he did not complete the domestic violence packet with J.S. until after he had sent the other officers to make contact with Gipp and that J.S.'s written statement "was not consistent with the threat [J.S.] had conveyed to him." The court also noted that Green did not share with the other officers the original threat alleged by J.S. or her written domestic violence witness statement and he did not tell them that parts of her story were "difficult to follow and inconsistent." The arresting officers also did not share with Officer Green Gipp's version of the encounter or his mother's corroboration of this, or anything else they were told about the incident.

{¶ 22} The court concluded:

A single witness' unreliable accusation is insufficient to create probable cause to arrest for domestic violence without further corroboration when that witness is also suspected of domestic violence. * * * While it provides reasonable suspicion of criminal activity justifying further

investigation, the totality of the circumstances must be considered, including both incupatory and exculpatory evidence. An officer can fail to reasonably formulate probable cause to arrest by refusing to consider potentially exculpatory evidence from a witness's explanation of an incident.

Here, the Court finds that the arresting Officers had reasonable grounds to investigate [Gipp] for domestic violence but not to arrest him. The Officers were not supplied with the alleged threat or the written statement before they made their arrest. By the time Officer Green visited the arrest scene, there were indications that [J.S.'s] allegation and statement were not consistent or reasonably trustworthy. However, Officer Green did not share this with Officers Moreland and Lyons. When Officers Moreland and Lyons questioned [Gipp], they learned that [J.S.] was also a suspect. They had no other witness corroborating [J.S.'s] version of events, while [Gipp's] mother corroborated his version. The Officers based their decision to arrest on [Gipp's] failure to deny threatening [J.S.] when the evidence shows that he denied hitting or threatening her. [Gipp] and his mother supplied the arresting Officers with inculpatory and exculpatory evidence that the Officers chose to disregard without further investigation.

Based on the totality of the circumstances, Officers Green, Moreland, and Lyons together did not possess facts adding up to probable cause to detain and arrest [Gipp]. The Court finds that [Gipp] was unlawfully detained when the Officers put their hands on him and advised that they

were going to take him to jail.

Based on these conclusions, the court suppressed "[e]verything that occurred as a result of [Gipp's] unlawful detention."

**{¶ 23}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). " 'Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *State v. Brown,* 2016-Ohio-4973, 67 N.E.3d 1278 ¶ 7 (2d Dist.), quoting *Burnside* at ¶ 8. "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." *Id.*

**{¶ 24}** Generally speaking, "[p]robable cause exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed an offense. * * * If an arrest is made without probable cause, the arrest is constitutionally invalid." *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶ 26. "Whether a law enforcement officer possessed probable cause or reasonable suspicion to detain an individual must be examined in light of the totality of the circumstances viewed from the

standpoint of an objectively reasonable police officer." *State v. Hammer*, 2023-Ohio-1307, 213 N.E.3d 238, ¶ 23 (2d Dist.). This typically requires a showing that the officer making the stop or arrest was personally aware of sufficient facts to justify it. *State v. Pickett*, 2017-Ohio-5830, 94 N.E.3d 1046, ¶ 9 (2d Dist.), quoting *City of Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999).

{¶ 25} R.C. 2919.25, which proscribes domestic violence, states: "(C) No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." The Ohio Revised Code specifically requires local police departments to adopt procedures and policies related to officer responses to alleged domestic violence pursuant to R.C. 2935.03. *See* R.C. 2935.032(A).

{¶ 26} R.C. 2935.03(B)(3)(b) sets forth Ohio's preferred arrest policy in domestic violence cases: "If * * * a peace officer has reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in this state that the officer arrest and detain that person pursuant to division (B)(1) of this section until a warrant can be obtained." As noted in *O'Neill*, 2015-Ohio-815, 29 N.E.3d 365, "not only does R.C. 2935.03(B)(3)(b) state that a warrantless arrest is 'the preferred course of action' in domestic violence offenses, but R.C. 2935.03(B)(3)(c) also *requires* an officer who does not comply with the preferred arrest policy to 'articulate in the written report of the incident * * * a clear statement of the officer's reasons *for not arresting and detaining that person* until a warrant can be obtained.' " *Id.* at ¶ 28.

{¶ 27} R.C. 2935.03 states:

(B)(1) When there is reasonable ground to believe that * * * the offense of domestic violence as defined in section 2919.25 of the Revised Code * * * has been committed * * * a peace officer described in division (A) of this section may arrest and detain until a warrant can be obtained any person who the peace officer has reasonable cause to believe is guilty of the violation.

* * *

(3)(a) For purposes of division (B)(1) of this section, a peace officer described in division (A) of this section has reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that a particular person is guilty of committing the offense if any of the following occurs:

(i) A person executes a written statement alleging that the person in question has committed the offense of domestic violence * * * against the person who executes the statement * * *.

* * *

(ii) No written statement of the type described in division (B)(3)(a)(i) of this section is executed, but the peace officer, based upon * * * any other information, including, but not limited to, any reasonably trustworthy information given to the peace officer by the alleged victim of the alleged incident of the offense * * * concludes that there are reasonable grounds to

believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that the person in question is guilty of committing the offense.

{¶ 28} Finally, regarding Lyons and Moreland's authority to arrest Gipp when Green was the one who spoke with J.S. directly, we point out the "collective knowledge doctrine" or the "fellow officer rule," by which the knowledge of one law enforcement officer may be imputed to other officers. *State v. Muldrow*, 2016-Ohio-4774, 68 N.E.3d 260, ¶18 (10th Dist.), citing *State v. Ojezua*, 2d Dist., 2016-Ohio-2659, 50 N.E.3d 14, ¶ 30. "[L]aw-enforcement officers cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." *State v. Stewart*, 193 Ohio App.3d 716, 719, 2011-Ohio-2910, 953 N.E.2d 886 (8th Dist.), citing *United States v. Hensley*, 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Specifically, " 'vertical collective knowledge' * * * involves situations [in which] one officer has probable cause [or reasonable suspicion] and instructs another officer to act, but does not communicate the corpus of the information known to the first officer that would justify the action." *Ojezua* at ¶ 32, quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

{¶ 29} In our view, Green had reasonable grounds to believe that Gipp had committed domestic violence against J.S. after speaking with her. Although he asked Lyons and Moreland to arrest Gipp prior to the execution of J.S.'s written statement, the request flowed from his conclusion that J.S. had provided reasonably trustworthy information regarding Gipp's conduct. As noted above, Green testified that J.S. reported

that Gipp had threatened to strike her, which she took as a legitimate threat; she believed he had been trying to hit her with a basketball hoop, and she had been afraid he would do so. Green advised the other officers to arrest Gipp and, in response, they executed the "preferred course of action," which was not to commence an investigation but to make an arrest. Pursuant to the collective knowledge doctrine, Lyons and Moreland made the arrest based upon their communication with Green. The officers' body camera videos revealed that Gipp denied striking J.S. but admitted that they had had an "altercation." To interpret R.C. 2935.03(B)(3)(b) to require further investigation would ignore the "preferred course of action" in such a situation, where Green had a reasonable belief that Gipp had committed domestic violence. Although an arrest without probable cause is constitutionally invalid, we conclude that reasonable grounds and reasonable cause under R.C. 2935.03 equate to probable cause, and that the arrest is this case was permissible.

{¶ 30} The State's assignment of error is sustained.

{¶ 31} The judgment of the trial court is reversed, and the matter is remanded for further proceedings.

. . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.